NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

25-P-710                                        Appeals Court


ADOPTION OF COLTON (and a consolidated case[1]).


No. 25-P-710.

Barnstable.     January 12, 2026. – July 7, 2026.

Present:  Singh, Hershfang, & Wood, JJ.


Department of Children & Families.  Adoption, Visitation rights.
     Parent and Child, Adoption, Custody of minor, Interference
     with parental rights.  Interference with Parental Rights.
     Abuse Prevention.



     Petitions filed in the Barnstable County/Town of Plymouth
Division of the Juvenile Court Department on February 8 and
March 25, 2021.

     The cases were heard by Mary O'Sullivan Smith, J.


     Lucas Newbill for the mother.
     Katelyn Bertino for Department of Children and Families.
     Alison A. Lowe for the children.


     HERSHFANG, J.  After trial, a judge of the Juvenile Court

entered decrees terminating the mother's parental rights to two

_____

     [1] Adoption of Alison.  The children's names are pseudonyms.

of her children, Alison and Colton.[2]  The mother maintains that the judge erred by placing too much weight on the mother's history rather than focusing on evidence of the significant and laudatory changes she had made.  She also asserts that the judge improperly failed to order posttermination visitation with the children.  We affirm.

Background.  Alison was born in June 2019.  At the time of trial, she was five years old.  Colton was born in January 2021.  At the time of trial, he was three years old.  The mother tested positive for marijuana and alcohol during her pregnancy with Alison, and both children were exposed to Suboxone, a substance taken by the mother to manage a heroin addiction that began after she was raped at age twelve and which, after many efforts, she had successfully learned to manage.  When Colton was eight days old, he was diagnosed with a skull fracture; both parents denied knowing the cause, and an investigation conducted pursuant to G. L. c. 119, § 51B, supported allegations of physical abuse by the parents.

Alison lived with both parents for approximately the first two years of her life.  Colton lived with both parents from his birth in January 2021 until May 2021, when the father was

---

[2] The father is not a party to this appeal, as he stipulated to the termination of his parental rights and entered into an open adoption agreement for both children in 2023.

awarded conditional custody of both children.  The mother had not had custody of either child since May 2021, although she lived with them occasionally, as discussed below.  In early November 2021, the Department of Children and Families (department) was awarded temporary custody of both children.  The children have been in a preadoptive kinship foster home since December 2021.

Beginning at age eighteen, the mother was the victim of domestic violence in her intimate relationships.  At age twenty-two, the mother became pregnant with her oldest child, who was in the department's custody and not a subject of this proceeding.  That daughter was removed by the department after the mother was in a collision while driving with the child in the car.  The mother was arrested and charged with possession of heroin and operating a motor vehicle while under the influence of drugs.

The mother and the father were married in 2019, shortly before Alison was born, when the mother was twenty-six years old.  Around that time, the maternal grandmother saw bruises all over the mother's body and worried that the father was abusing the mother.  Between 2020 and 2022, the parents obtained many abuse prevention orders against each other pursuant to G. L. c. 209A (209A orders).  Those included multiple 209A orders against the mother directing her to have no contact with and

stay away from the father.  Each parent sought 209A orders against the other and then violated them.  At different times, each parent was charged with assault and battery on the other.  Both children witnessed violence and arguments between their parents beginning at a very young age.  Despite the violence in their relationship and their frequent, bilateral restraining orders, the parents continued to live and vacation together.

The mother reported to the department that she had not used heroin since 2017, right before she began receiving Suboxone treatment.  She tested positive for cocaine twice since 2017, most recently in December 2021.  She also tested positive for codeine in January 2024, which was six months before trial commenced.  As part of the mother's action plan, the department asked her to submit to regular urine screens.  Since 2021, the mother many times tested positive for substances, including alcohol, marijuana, codeine, and Suboxone.  The mother missed numerous urine screens.

In May 2023, the department added a requirement to the mother's action plan tasks that the mother abstain from alcohol.  After the results of three screens were negative for alcohol in July and August 2023, the mother missed three months of urine screens.  The results of her last three urine screens before trial were positive for alcohol.  The mother completed one of her two scheduled substance use evaluations prior to trial.

That evaluation stated that although results of her urine screens have consistently been positive for "a low amount" of alcohol, she has "never presented as under the influence of any substance."

Addressing her history of domestic violence and trauma has been an ongoing effort for the mother.  Before the department took custody of the children, she engaged intermittently in therapy with a series of providers.  The mother has been diagnosed with posttraumatic stress disorder, anxiety, and bipolar disorder.  Twice she voluntarily sought inpatient mental health treatment, in May 2020 for seven days and in May 2022 for nine days.  She attributed these admissions to symptoms of postpartum depression that were exacerbated by the department's removal of the children.

Following the children's removal in early November 2021, the mother's action plan tasks included engaging with an individual therapist to address traumas related to her substance use history, addiction, and involvement with the department. Adding this requirement did not meaningfully change the mother's level of engagement with therapy.  The department gave the mother references and resources to help her meet the tasks on her action plan.  Although she expressed her willingness to participate, the record again reflects only intermittent engagement before August 2023.  Between May and August 2022, the

department could not assess the mother's use of services because the mother did not keep active releases for the department to speak to her providers. Between January and March 2023, she met four or five times with a new therapist but then stopped attending her sessions. As late as April 2023, she had yet to begin taking medication prescribed in February to treat bipolar disorder. Beginning in August 2023, she engaged in weekly therapy with a second therapist. She continued this treatment through trial.

Throughout the pendency of the case, the mother experienced instability in housing and employment. During the period of the department's involvement with Alison and Colton, the mother lived with her own parents, with the children's father (sometimes in violation of active restraining orders), in a motel, in her car, in shelters, and in her own apartment. When confronted in October 2021 about living with the father in violation of restraining orders and custody arrangements, the mother told a department social worker that she and the father had been "together this whole time" and asserted that she would "continue to violate whatever to be able to spend time with [her] kids." In September 2023, the mother found stable housing in Providence, Rhode Island, where she had a three-bedroom, two-bathroom apartment.

From the time of Alison's birth, the parents' volatile relationship was central to their family life.  The children were removed in April 2021 because they were being put in the middle of the parents' constant fighting, yet the parents failed to comply with repeated requests by the department to stop spending time together.  The parents violated the conditional custody order by communicating in emotional text messages, telephone calls, and in-person exchanges of the children.  They argued in front of the children and struggled to coparent.  In May 2021, the police were dispatched to the father's home because the parents were arguing.  The father obtained another 209A order against the mother.

The parents continued their tumultuous relationship.  In September 2021, they traveled together to New York City to celebrate the father's birthday, leaving each child with a caretaker not approved by the department.  On the way home, the parents picked up Alison, arguing bitterly.  The mother, father, and children were living together at the time, unbeknownst to the department and in violation of the conditional custody order.

Some of the parents' disputes were physical or involved threats of physical violence.  In October 2021, the mother reported that the father had "choked" her in the presence of both children and that Alison had tried to intervene by hitting

the father.  The father reported that the mother had "hacked into his phone" and changed his voicemail greeting and that she had left him over one hundred threatening voicemail and text messages, some of which were later corroborated by a department social worker.

The parents twice went to Las Vegas together and misrepresented their whereabouts to the department.  In late December 2021, the parents canceled two scheduled visits with the children, claiming they had COVID-19.  Actually, they had been in Las Vegas.  At that same time, a department social worker had sent the mother a $325 gift card to help pay for rent, but a week later, the mother had to move out of her room in a motel because she owed $300.  The mother showed poor money management skills and prioritized taking a vacation over having stable housing.  She gave conflicting statements about where she was living, asserting that she was living in her car or, alternatively, with the father.

In January 2022, the parents received a judgment of divorce nisi, with a finalization date of April 28, 2022.  This did not end their troublesome patterns.  That same month (January 2022), the police were called to the father's home for an alleged mutual assault by the parents.  The father reported that the mother had punched him repeatedly on the left side of his face, which was red.  The mother reported that the father had grabbed

and punched her, showing the officer that her neck and chest were red. The mother reported to a department social worker that she had again been living with the father. Another 209A order issued against the mother, effective for one year, that forbade her from contacting the father, coming within twenty-five yards of him, or coming to his residence.

Between February 26 and March 6, 2022, while the 209A order remained in effect, the mother again traveled to Las Vegas with the father. When asked about this trip, the mother explained that she had minimized its costs; she acknowledged having asked the department for financial assistance when traveling to Las Vegas and asked, "aren't we supposed to use our resources?"

In March 2022, the mother again violated the 209A order and was arrested at the father's house. She missed a visit with the children because she was incarcerated. In July 2022, the mother sought out the father's new girlfriend on an online social media site, broke into his voicemail and listened to a message from the girlfriend, and reported to the department that the father had shown up at her work location. The 209A order against the mother was still in effect at that time.

On July 31, 2022, the mother was living on Cape Cod and the father in New Bedford, yet they ended up at a pub in New Bedford at the same time. They fought over the mother's cellular telephone and the father hit the mother. The mother admitted to

police that she knew she was violating the 209A order by meeting the father.  The mother was arrested for violating the 209A order and the father was charged with assault and theft.  Despite this, during a late-August visit with the children, the mother told them details about their next visit with the father, leading the trial judge to infer that the mother had communicated with the father even after the pub incident on July 31, 2022.  This conflicted with the mother's reports that she had no contact with the father since then.

The mother's action plan tasked her with completing domestic violence counselling programs.  Although she had a fitful start, she completed two in October 2022.  And, in December 2023, she completed a program called "Behavioral Health Supports for Justice Involved."  Since 2022, the mother has not been accused of violating a 209A order.

Still, the mother's contact with the father continued.  In November 2022, the mother sent an e-mail message with an online video recording of the father's fiancée to a department social worker.  On January 24, 2023, a department social worker listened to a voicemail the mother had left for the father earlier that month.  The father knew facts about the mother's life, including that her car had been repossessed in November.  Also in January 2023, the mother reported that the father was harassing her on social media and had shown up at her home and

flattened her tires. The mother subsequently obtained a 209A order against the father on January 27, 2023, but three months later, while the order remained in effect, continued to monitor the father's social media posts, which she showed to a department social worker. When asked about this by a department social worker and a court investigator, the mother denied having done so. She told the court investigator she had not had any contact with the father since the summer of 2022. The trial judge did not credit these denials, remarking that the father "was also aware of [the m]other's car being repossessed" in November 2022 and that the mother "continued to monitor [the father's] social media and keep up with his life" after she obtained a 209A order in January 2023.

The mother frequently blamed others for the positive results on her drug and alcohol screens. When her urine tested positive for cocaine, the mother denied using the drug and suggested that she might have been exposed to it from hugging her brother (a cocaine user) or from the father's having laced her marijuana with cocaine. She offered to take a hair follicle test if the department would pay for it but did not take the test when the funds were secured. In October 2022, she blamed irregularities in her Suboxone use on the father's having purportedly stolen her prescription. In June 2023, the mother claimed that her car had been repossessed with her prescriptions

inside, so she was not taking either her prescribed Suboxone, which she was buying on the street or getting from a friend, or her psychiatric medications. In July 2023, the mother told a department social worker that she believed the maternal grandmother was "sabotaging" her by putting alcohol in her food, claiming she had not consumed alcohol since April 2023. On January 4, 2024, after testing positive for codeine, the mother denied using codeine and asked for a urine screen, then did not produce the result to the department.

The mother, at times, deprived the department of requested information about her substance use and participation in services in general. For example, although it was a part of the conditional custody order and a task on her action plan that the mother sign all necessary releases, the mother did not do so. And between February and May 2022, the department was unsuccessful in obtaining urine screens from the mother; when those screens were later produced, the results were all positive for alcohol. The mother testified at trial that her positive alcohol screens resulted from her being required to drink as part of her bartending jobs, an explanation that the judge did not credit but rather viewed as "additional evidence of [the m]other's lack of accountability for her actions."

In April 2023, the mother was unemployed. She gave conflicting reports to the department and her Suboxone provider

about where she was living.  To the Suboxone provider, she reported that she was spending most of her nights at the home of a boyfriend who had been released from jail and was on house arrest.  To the department, she reported that she was living at the maternal grandparents' home.

The mother's move to an apartment in Providence in September 2023 coincided with new stability in her life.  She obtained that apartment with the help of a community outreach worker who had been advising her about money management skills and housing applications weekly since early 2023.  She continued to see her psychiatric nurse practitioner and her Suboxone provider.  She also met weekly with a new therapist.  The mother reported to a department social worker that she had ended a new relationship when she noticed that her partner was getting angry easily and raising his voice.  The mother had a new car as well as a new job.  When asked by the social worker, the mother described having learned many ways to seek and cultivate healthy relationships.

In October 2023, the mother completed a six-part education series, "Raising Healthy Families."  When the father reached out to her the next month on social media, the mother reported having sent him an e-mail message telling him they could not communicate with each other.  When the social worker asked to see the mother's prescription medications, the mother was

initially unable to locate them; when she found them, it had been more than three months since she had filled her prescriptions for treatment of bipolar disorder and anxiety. In early 2024, she reported that she was taking her medications as prescribed.

Between November 2021 and August 2024, when trial was underway, the mother consistently attended visits with the children, which generally went well. The mother was largely appropriate, and the children were happy. The judge found that "[t]he visits would end well with [the m]other bringing the children to the social worker's car and giving them hugs and kisses." However, Alison and Colton both struggled behaviorally after the visits. The judge found that "[t]he children are confused by statements [the m]other makes about going home and talking about their bedrooms at home." As a result, the department reduced the mother's visits from one hour weekly to ninety minutes every other week and required every other visit to occur at the public library. The mother testified at trial that if she was awarded custody of Alison and Colton, she would need at least six months before she could care for them full time. She explained that she needed time to "get to know" the children, because "she barely knows the[m] and they barely know her."

Since December 2021, the children have lived together in a preadoptive kinship foster placement. Alison was two years old at the time they entered this home and Colton was ten months old. The preadoptive father is a sibling of the children's maternal grandmother (a great uncle) who is only about ten years older than the mother. The preadoptive mother is his long-term partner and fiancée; she works as a supervisor at the local hospital. The preadoptive parents ensured that Alison got the therapy she needed and supported her therapeutic needs at home. She was doing well in school and enrolled in swim and dance classes. She was a good big sister to Colton. Colton successfully completed an early intervention program. The preadoptive father helped Colton adjust after visits with the mother, which caused "aggressive behaviors towards his peers at daycare." Colton sought out the preadoptive father for attention and affection and the preadoptive father was patient and calm with him. Both children were thriving in the preadoptive placement.

Discussion. 1. Termination of parental rights. "Although the law recognizes that the custody, care and nurture of the child reside first in the parents, where those parents have failed to fulfil the duties of parenthood, their rights are no longer paramount" (quotation and citation omitted). Department of Pub. Welfare v. J.K.B., 379 Mass. 1, 5 (1979). "In deciding

whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011). For evidence to be clear and convincing "[t]he requisite proof must be strong and positive; it must be 'full, clear and decisive.'" Adoption of Chad, 94 Mass. App. Ct. 828, 838 (2019), quoting Adoption of Iris, 43 Mass. App. Ct. 95, 105 (1997), S.C., 427 Mass. 582 (1998).

The decision to terminate parental rights requires "a two-part analysis." Adoption of Nancy, 443 Mass. 512, 515 (2005). "First, the judge must find that the parent is presently unfit." Adoption of Cadence, 81 Mass. App. Ct. 162, 167 (2012). "The judge 'must also find that the current parental unfitness is not a temporary condition.'" Adoption of Querida, 94 Mass. App. Ct. 771, 777 (2019), quoting Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018). "Second, the judge must find that 'it would be in the child's best interests to end all legal relations between parent and child.'" Adoption of Cadence, supra, quoting Adoption of Nancy, supra.

"We review the judge's findings with substantial deference, recognizing her discretion to evaluate a witness's credibility and to weigh the evidence," Adoption of Nancy, 443 Mass. at 515,

"and [we] reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. at 59. On appeal, "we do not disturb" findings where the challenge is "based on the judge's credibility determinations." Adoption of Querida, 94 Mass. App. Ct. at 778.

The mother does not contest the trial judge's subsidiary findings of fact. Instead, she challenges the judge's weighing of the evidence, asserting that the judge paid inadequate attention to the mother's "present flourishing" and too much to her past conduct. "In the main [her] arguments simply reflect dissatisfaction with the judge's 'weighing of the evidence and [her] credibility determinations.'" Adoption of Hugo, 428 Mass. 219, 224 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999), quoting Adoption of Quentin, 424 Mass. 882, 886 n.3 (1997). But "the judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference." Custody of Eleanor, 414 Mass. 795, 799 (1993). A judge is neither obligated to credit all evidence equally, see Care & Protection of Three Minors, 392 Mass. 704, 711 (1984), nor "required to view the evidence from the parent's perspective." Adoption of Lisette, 93 Mass. App. Ct. 284, 295 (2018).

The mother stipulated to her current unfitness in May 2023, and the children were committed to the permanent custody of the department. Since then, she emphasizes, much has changed. And so it had. The mother made significant strides in maintaining sobriety from heroin; she found suitable housing; she was employed, at least seasonally, in a professional position, and when that job waned, she found other work so as to maintain an income; and she terminated a relationship when she realized her partner was "getting mad easily and raising his voice." She completed an education series, "Raising Healthy Families." She rejected one communication from the father. She attended virtual meetings of "Alcoholics Anonymous" and "Narcotics Anonymous."

The judge's findings acknowledged each of these laudable advances. Nonetheless, "[a] judge properly may consider a pattern of parental neglect or misconduct in determining future fitness and the likelihood of harm to the child." Adoption of Elena, 446 Mass. 24, 33 (2006). "Although 'stale information cannot be the basis for a finding of current parental unfitness . . . history . . . has prognostic value.'" Adoption of Jacques, 82 Mass. App. Ct. 601, 607 (2012), quoting Adoption of George, 27 Mass. App. Ct. 265, 268 (1989). "[A] judge's conclusion that a parent's unfitness is temporary," and termination of parental rights is therefore not warranted, "must

rest on credible evidence supporting a reasonable likelihood that the parent will become fit, not on a 'faint hope.'" Adoption of Ilona, 459 Mass. at 59, quoting Adoption of Inez, 428 Mass. 717, 723 (1999).  "Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary."  Adoption of Ilona, supra at 59-60.

The mother lost custody of Alison and Colton three years before this matter came to trial, a period longer than one-half of Alison's life and all of Colton's.  In that time, and despite her evident and heartfelt desire to be their custodial parent, the mother persisted in patterns of behavior that endangered that possibility.  Despite her significant positive steps -- which we do not overlook, and which are a credit to her -- the judge found that aspects of the mother's troubling history persisted from May 2023 to the time period of the trial, and she inferred from that evidence that the mother had not truly changed.  In June 2023, for example, the mother informed her psychiatrist that she was not taking her prescribed Suboxone or her psychiatric medications.  She was taking her friend's Suboxone or buying it "off the street" and living in her car. When she tested positive for alcohol that month, the mother

complained that the maternal grandmother was sabotaging her by putting alcohol in her food, and that she had not drunk alcohol since April 2023. She did not attend a foster care review on November 2, 2023.

The mother also continued her troubling and violent relationship with the father, despite the existence of 209A orders against her (which the judge found she repeatedly violated), contrary action plan tasks, and multiple requests by the department that she stop. "It is well documented that witnessing domestic violence, as well as being one of its victims, has a profound impact on children." Custody of Vaughn, 422 Mass. 590, 599 (1996). "Violence within a family is highly relevant to a judge's determination of parental unfitness and the best interests of the children," Adoption of Gillian, 63 Mass. App. Ct. 398, 404 n.6 (2005), because a child who witnesses "such abuse suffers a distinctly grievous kind of harm." Custody of Vaughn, supra at 595. The mother repeatedly misled the department with respect to her contact with the father into at least early 2023. The trial judge found that the mother "significantly minimize[d] her role" in the parents' "toxic" relationship and the effects of that abusiveness on Alison and Colton. Thus, "[t]he evidence in this case supported the judge's reliance on domestic violence as a significant

factor in deeming the mother unfit."  Adoption of Jacob, 99 Mass. App. Ct. 258, 264 (2021).

In both November 2023 and February 2024, the department discovered evidence suggesting the mother was not regularly taking her prescribed medications.  She declined department home visits in December 2023 and January 2024.  Also that January, her urine tested positive for codeine and alcohol but not her prescribed medications.  As had been true with the positive cocaine results, the mother denied using codeine; once again she was afforded an opportunity to get a second test, but again she did not do so.  This evasive behavior in avoiding home visits, combined with the positive results of urine screens and the mother's denial that she had used a substance revealed by the screens, echoed some of her earlier behavior.  In a further echo, she missed three appointments with her psychiatrist between October 2023 and January 2024 and stated two months before trial that she would not have so many appointments with providers if the department were not involved.

Trial began in June 2024.  That September, the mother missed two trial dates because she was in Florida for a business trip.  The judge did not credit the mother's testimony that her return had been delayed when she contracted COVID-19, and the judge then concluded that the mother's decision to leave Massachusetts during trial "call[ed] into question her judgment

and priorities" regarding her children. "[A] trial judge has discretion to determine whether to draw an adverse inference from a parent's absence. . . . In determining whether to exercise that discretion, 'the judge as fact finder' is to consider whether such an inference is 'fair and reasonable based on all the circumstances and evidence before' her." Adoption of Talik, 92 Mass. App. Ct. 367, 372 (2017), quoting Singh v. Capuano, 468 Mass. 328, 334 (2014).

The judge was "entitled to consider the evidence of [the mother's] recent improvements within the context of her earlier and continuing deficits." Adoption of Jacques, 82 Mass. App. Ct. at 608. And where, as here, the "judge's factual findings were specific and detailed, demonstrating that close attention was paid to the evidence and the fourteen factors listed in G. L. c. 210, § 3 (c)," we cannot say that the trial judge clearly erred by not including specific facts or giving more weight to certain facts than others. Adoption of Nancy, 443 Mass. at 516. Considering the evidence of the mother's longstanding history with domestic violence and substance misuse; her continued failure to confront her own role in both, and their impact on Alison and Colton; her persistent refusal to take responsibility for positive results of drug and alcohol tests; and her poor money management history, "the judge did not clearly err in finding that the mother was unfit and that her

unfitness was not temporary." Adoption of Ilona, 459 Mass. at 62.[3]

"Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period." Adoption of Ilona, 459 Mass. at 60. By the time trial concluded in October 2024, Alison and Colton were both "thriving" in the preadoptive placement where they had been for three years. The mother, by her own testimony at

---

[3] The dissent compares the facts in the present case to those in Adoption of Arianne, 104 Mass. App. Ct. 716 (2024), and sees this case as more favorable to the mother. We do not see it that way. The mother in Adoption of Arianne, id. at 717, had successfully parented her child for the first two and one-half years of the child's life before voluntarily placing her in the care of the child's godmother (who was also a relative of the mother) for about ten months. Shortly after the child was returned, the mother again placed her with the relative, because the mother was in a violent relationship from which she sought to shield the child. Id. In vacating the decree terminating the mother's parental rights, we said, "[t]he fundamental problem with the judge's decision is that the judge treated the mother's placing the child in the care of the godmother as neglect." Id. at 721. We concluded that it was "not neglect for a parent who recognizes that she cannot provide her child with a safe or appropriate environment to place the child with appropriate caregivers"; instead, that was "the mark of a responsible parent." Id. We emphasized that a "single instance of domestic violence while the child lived with the mother, where the mother's response protected the child from further exposure to domestic violence, does not demonstrate that the mother's current unfitness is likely to last indefinitely." Id. at 723. No such facts were present here, where the mother's parenting challenges, including a toxic domestic relationship, persisted for years; she did not extricate the children; and, at the time of trial, she continued to exhibit concerning behaviors related to drug and alcohol use, truthfulness with the department, and accountability for her actions.

trial, felt she needed at least six more months before she might be capable of parenting Alison and Colton full time. For five years since Alison was born, however, the department had already been providing services to the mother aimed at preparing her to parent the children full time. Where the mother had become stable only in the year before trial and acknowledged she still needed more time, "the court must say, 'Enough,' and act in the children's best interests." Adoption of Inez, 428 Mass. at 724, quoting Adoption of Carlos, 31 Mass. App. Ct. 233, 242 (1991), S.C., 413 Mass. 339 (1992). Affording "substantial deference" to the trial judge's findings, as we must, Adoption of Nancy, 443 Mass. at 515, we cannot say that she "abused [her] discretion or committed a clear error of law" in concluding that the mother's current unfitness was not likely to be temporary. Adoption of Elena, 446 Mass. at 30.

2. Posttermination visitation order. The mother also challenges the judge's conclusion that it was not necessary to enter an order for posttermination visitation. While we agree with the department that this issue could have been better preserved for appeal, we exercise our discretion to address it, as the judge discussed it in her decision. See Adoption of Mary, 414 Mass. 705, 712 (1993). A "judge who finds parental unfitness to be established has broad discretion to determine what is in a child's best interests with respect to custody and

visitation with biological family members thereafter." Adoption of Rico, 453 Mass. 749, 756 (2009). In determining whether such visitation is in a child's best interests, the judge must consider whether the child has a "significant, existing bond with the biological parent" and whether "the child 'has formed strong, nurturing bonds'" with a preadoptive family. Adoption of Ilona, 459 Mass. at 63-64, quoting Adoption of Vito, 431 Mass. 550, 563 (2000). "A judge should issue an order of visitation only if such an order, on balance, is necessary to protect the child[ren]'s best interest[s]." Adoption of Ilona, supra at 65.

The judge concluded that, while the evidence "demonstrate[d] that [the m]other's visits with the children generally went well, and the children were happy to see her" and had "fun at visits with their mother," they also had "a hard time following the visits and [took] a couple of days to regulate." The judge noted the mother's testimony that the children barely know her, and she barely knows them; she further noted that the preadoptive parents "support[ed] continued contact between the children and [the m]other so long as [the m]other is sober and her mental health is stable." The judge's ultimate conclusion that a visitation order was not necessary to protect the children's best interests followed her careful weighing of the evidence of the children's bonds with their

mother against their needs and connections with the preadoptive family.  We discern no abuse of discretion in the judge's ruling.

<u>Decrees affirmed</u>.

WOOD, J. (dissenting).

"The natural bond between parent and child should not be permanently severed unless the child's present or future welfare demands it.  None of our cases, in which we have said that current parental unfitness is a prerequisite to the allowance of a petition to dispense with consent to adoption, should be construed as requiring such an extreme step whenever the parents are currently unfit, or as limiting the inquiry to parental fitness at the time of trial."

Adoption of Carlos, 413 Mass. 339, 350 (1992).

To establish that the termination of parental rights is warranted, it is not enough to find that the parent is currently unfit.  "The judge must also find that the current parental unfitness is not a temporary condition" (quotation and citation omitted).  Adoption of Querida, 94 Mass. App. Ct. 771, 777 (2019).  There must be clear and convincing evidence that "the mother's current unfitness is likely to continue indefinitely."  Adoption of Arianne, 104 Mass. App. Ct. 716, 721 (2024).  "The requisite proof must be strong and positive; it must be 'full, clear and decisive'" (citation omitted).  Adoption of Iris, 43 Mass. App. Ct. 95, 105 (1997), S.C., 427 Mass. 582 (1998).

I agree with the majority that the judge did not clearly err or commit an abuse of discretion in finding that the mother was currently unfit at her 2024 trial.  But I disagree with the majority's second conclusion that the judge did not clearly err or commit an abuse of discretion in ruling "that said unfitness

is likely to continue into the indefinite future to a near certitude."

The judge found that the mother's "lack of progress throughout the pendency of this matter is a strong indicator that her unfitness will continue undiminished into the future with an attendant harmful [e]ffect on the children." In fact, the record evidence established, and the majority acknowledges, that the mother made significant "progress" since the Department of Children and Families (department) was granted temporary custody of her children in November 2021. Specifically, the mother made great strides in managing her substance use disorder; freeing herself from a "toxic," violent domestic relationship; and achieving safe housing and financial stability. Collectively, this progress established an undeniable upward trend toward fitness, such that the judge clearly erred in weighing the factors relevant to the decision whether the mother's "unfitness is likely to continue into the indefinite future to a near certitude." See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014) (defining abuse of discretion). "The judge, having been alerted to what had been reported as the mother's recent positive gains, should have considered whether she would be likely to improve in the future." Adoption of Imelda, 72 Mass. App. Ct. 354, 363 (2008). Accordingly, I dissent.

The judge focused on three areas of concern in the mother's life:  (1) her substance misuse; (2) her past abusive relationship with the children's father; and (3) her financial irresponsibility in the face of housing insecurity.  I discuss each area of concern as well as the mother's health.

1.  Substance misuse.  The mother struggled to overcome a heroin addiction in rehabilitation programs for fourteen years, from the ages of twelve to twenty-six.  Then, in January 2018, she began receiving Suboxone treatment (before either of the subject children were born).  She had been sober from heroin since that date.  Indeed, during the pendency of this case, the mother took eighteen department-mandated urine screens, from August 2021 to April 2024, all of which showed results that were negative for heroin.

The mother tested positive for cocaine twice in 2021, and once for codeine in January 2024.  The mother drank alcohol and used marijuana in moderation, but her substance use evaluator did not report any concerns about that behavior.  The mother never presented as intoxicated during nearly three years of weekly supervised visits with her children, from November 2021 to June 2024, and was never reported to have been under the influence anywhere else.

The majority focuses on the fact that the department's action plan tasks gave clear instructions to abstain from

alcohol, and the fact that the mother repeatedly deflected and avoided responsibility for her alcohol consumption. I agree that the mother's deflection of responsibility for consuming alcohol supports the judge's finding of current unfitness.

But it is also clear that the mother's multiyear struggle to maintain sobriety demonstrated a sustained commitment to achieving parental fitness. To the extent that the judge was concerned the mother's use of alcohol and marijuana supported a potential relapse into substance abuse, "[t]he passage of [more than] four years [since she achieved sobriety] is too long a period to rely on the predictive value of past behavior without verification -- especially when evidence contradicting the prediction is readily available" (footnotes omitted). Adoption of Rhona, 57 Mass. App. Ct. 479, 486 (2003), S.C., 63 Mass. App. Ct. 117 (2005).

2. Domestic violence. The mother had a toxic and destructive relationship with the father. But over the course of six months from August 2022 to January 2023, she extracted herself from that relationship. At the very least, that achievement demonstrated progress toward fitness, and undermined the probative value of this factor as evidence of permanent unfitness.

The mother scheduled an intake appointment with a provider on August 15, 2022, seeking to reengage in its domestic violence

education and prevention services.  As the majority notes, the mother completed two domestic violence counselling programs.  On January 27, 2023, she obtained a restraining order against the father.[1]  From that point forward, there is no evidence that she had contact with the father except for a single e-mail message in November 2023, following the father's violation of that order, to tell him that they could not communicate.[2]  Finally, in October 2023, she completed a third education program about domestic violence, a six-part series entitled "Raising Healthy Families."

"At trial, there was no evidence presented that domestic violence . . . was still present in the mother's life."  Care & Protection of Laurent, 87 Mass. App. Ct. 1, 4 (2015).  Nothing in the record suggested that the mother had seen or even spoken to the father in the twenty-one months leading up to and during trial.  Accordingly, the evidence does not support the judge's conclusion that "[i]f the children were returned to [the

---

[1] The mother obtained multiple extensions of the order, and the father was arrested and charged with violating that order in November 2023.

[2] To the extent that the majority and the judge relied on the mother's choice to view the father's public social media posts after she had obtained a restraining order as evidence of unfitness, I disagree.  Again, the mother's termination of her relationship with the father and the absence of evidence of contact with him after January 2023 rendered that relationship irrelevant to the mother's fitness by the June 2024 trial date.

m]other, it is likely the parents would reengage in communication, and [the m]other would be vulnerable to further abuse from [the f]ather."

    3. <u>Housing instability and financial irresponsibility</u>. The judge noted that in December 2021 and February 2022, the mother used department housing funds to travel to Las Vegas with the father. I agree with the judge and the majority that this "showed poor money management skills and [that she] prioritized taking a vacation over having stable housing." <u>Ante</u> at 8. The judge also noted that her decision to leave Massachusetts during trial "call[ed] into question her judgment and priorities to her children." Although I agree that this evidence supports the judge's finding of current unfitness, it was also clear that the mother acknowledged her financial irresponsibility, sought help to address it, and made progress in achieving that goal.

    First, the mother maintained relatively steady employment throughout the pendency of this matter, despite experiencing seasonal layoffs and housing instability. Second, in early 2023, at the same time that she was ending the toxic relationship with the father, the mother engaged with a community outreach worker. He met with the mother weekly to teach her money management skills and help her fill out housing applications. With his help, the mother obtained a subsidized apartment in Providence on September 1, 2023.

Also, the mother's undisputed record of consistent and loving weekly visits with her children from 2021 through 2024 spoke to "her judgment and priorities to her children." Collectively, the mother's behavior demonstrated her ongoing commitment to improve her financial situation, maintain "adequate stable housing," and prioritize building a better life for her children. Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008).

4. Medical and psychiatric diagnoses. Finally, the majority notes that the mother struggled consistently to engage with individual therapy and to take medication prescribed to treat diagnosed medical and psychiatric conditions. But neither the majority nor the judge identified any nexus between those shortcomings and a risk of harm to the children. "Mental [illness] is relevant only to the extent that it affects the parents' capacity to assume parental responsibility, and ability to deal with a child's . . . needs." Adoption of Luc, 484 Mass. 139, 146 (2020), quoting Adoption of Frederick, 405 Mass. 1, 9 (1989). The judge made no such finding here.

Moreover, the mother made progress managing symptoms which corresponded to her diagnoses. First, in January 2023, as she was ending her toxic relationship with the father, she engaged a therapist for a few sessions. Then, after five months of searching for a new therapist, she found one in August 2023.

She met with him weekly throughout the trial; by October 2024, she had consistently participated in mental health and substance abuse counselling for fourteen months. Second, at the beginning of 2023, the mother reengaged with her psychiatric nurse practitioner (NP), who prescribed medications to manage symptoms of the mother's conditions. Although the evidence supported the judge's findings that the mother struggled to manage her medication regimen, it also supported that she was making progress on that front. By the start of trial in June 2024, the psychiatric NP reported to the department that she had no concerns about the mother. In any event, as noted, the judge did not find that the mother's diagnoses "affect[ed] [her] capacity to assume parental responsibility." Adoption of Luc, 484 Mass. at 146.

Collectively, in every area of concern, the mother made "significant progress" toward parental fitness, beginning at least eighteen months before trial. Adoption of Carlos, 413 Mass. at 351. This evidence of progress "casts doubt on several of the findings central to the judge's decision." Adoption of Imelda, 72 Mass. App. Ct. at 363. Indeed, the judge's findings of likely future unfitness despite such significant progress over an eighteen-month period before trial is contrary to this court's precedent.

In Adoption of Arianne, 104 Mass. App. Ct. at 721, we held that the trial judge abused his discretion and committed an error of law in terminating a mother's parental rights based on a finding that the mother's inconsistent engagement with family action plan tasks established that her current unfitness was likely to continue indefinitely. After successfully extracting herself from a violent relationship, the mother in Adoption of Arianne participated in a domestic violence support group and individual therapy -- but only for a few months at a time, and never as consistently as required by her action plan. See id. at 718-720. She became involved in another toxic relationship, but she left that situation after a single incident of domestic violence. Id. at 718. The mother in Adoption of Arianne participated inconsistently in meetings with her parenting aide, visits with her child, and appointments with her department social worker. Id. at 719. She missed the first day of her termination trial without a reasonable excuse. Id. And yet, this court held that because the mother had escaped from a violent relationship and was working toward fitness, albeit imperfectly, the trial judge's findings did not provide clear and convincing evidence that her present unfitness was likely to continue indefinitely. Id. at 722-723. The mother in this case demonstrated greater consistency in visits and compliance with

her action plan tasks than the mother in Adoption of Arianne.[3]
This case is more like the illuminating case of Adoption of
Carlos, 413 Mass. at 351, in which the Supreme Judicial Court
affirmed the denial of a petition to terminate parental rights.
Following three years in which the department had custody of the
child, the court in Adoption of Carlos concluded that
improvement in the mother's "critical area of parental
unfitness" from June 1989 to the date of the evidentiary hearing

---

[3] The majority distinguishes Adoption of Arianne, 104 Mass.
App. Ct. at 722-723, by focusing on the judge's error in that
case of construing the mother's decision to leave the child with
a godparent as neglect.  But the majority does not discuss the
evidence in that case which we acknowledged supported a finding
of unfitness at trial, notwithstanding the judge's error, or
compare that evidence to the evidence of the mother's unfitness
in this case.  See ante at note 3.

After placing the child with her godmother, the mother in
Adoption of Arianne experienced at least two incidents of
domestic violence with one partner and then a third with a
subsequent partner.  See id. at 718.  More importantly, after
trial, the judge found that the mother still lacked insight into
the "impact that [domestic] violence could have on [the child]
outside of the physical removal from her mother's custody that
occurred as a result."  Id. at 718-719.  Furthermore, the mother
missed about one-quarter of her scheduled visits with her child,
and the first day of the termination trial because she "forgot
about it."  Id. at 719 & n.9.  We concluded that these
inconsistencies, as well as "[t]he mother's inconsistency with
completing action plan tasks, . . . established the mother's
unfitness to parent the child as of the time of trial because it
demonstrated a lack of focus on parenting the child."  Id. at
722.  Comparatively, by the time of trial in this case, the
mother here had a stronger, albeit still imperfect, "focus on
parenting the child."  Id.  Just as we recognized the absence of
clear and convincing evidence in Adoption of Arianne that the
mother lacked capacity to achieve fitness, I think we should
recognize the absence of clear and convincing evidence here.

in "early 1990" established "significant progress," and a reasonable likelihood that her unfitness at trial was only temporary when coupled with the fact that "[t]he child ha[d] been regularly visiting with his mother, and remain[ed] attached to her [and was] eager to return home."  Id. at 348, 351.

Because the evidence of the mother's progress undermined the judge's ruling "that [her] unfitness is likely to continue into the indefinite future to a near certitude," I cannot agree that the proof rose to a level justifying the "extreme step" of terminating the mother's parental rights (citation omitted). Adoption of Ilona, 459 Mass. 53, 59 (2011).  It was not strong, positive, full, clear or decisive, Adoption of Iris, 43 Mass. App. Ct. at 105; accordingly, I respectfully dissent.